Filed 10/8/20  P. v. Beushausen CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071434 |
| v. | (Super.Ct.No. INF1701836) |
| JAMES BEUSHAUSEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Russell L. Moore, Judge. Affirmed.

Law Office of Zulu Ali and and Zulu Ali, attorneys for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

James Beushausen got into a fight with his girlfriend, Jaylynn Keith, over his excessive drinking. The next day, after Beushausen returned from work, Keith ended up dead, shot in the middle of the forehead. Beushausen reported the shooting as a suicide. However, law enforcement determined Beushausen had been the shooter, and a jury convicted him of first degree murder.

He attacks his conviction on four grounds. He argues the trial court erred by failing to instruct the jury on the lesser offense of voluntary manslaughter because there was evidence he killed Keith in the heat of passion. He argues there was insufficient evidence of murder. He argues the prosecutor committed misconduct by comparing him to a child molester. And he argues the trial court erred by admitting lay opinion evidence the victim was happy because it lacked foundation.

We conclude none of these arguments has merit and affirm the judgment.

**I**

**FACTS**

By March 15, 2017, the date of her shooting, Jaylynn Keith and James Beushausen had dated for five years and had lived together for five months. Beushausen and Keith both worked at Home Depot, but at different stores. Beushausen was a night assistant manager in Palm Springs. Keith had recently been promoted to a supervisory position in La Quinta and was working toward becoming an assistant manager.

Keith's friends and coworkers described her as a happy person, outgoing, cheerful, and positive. They said they'd never seen her suicidal or depressed and characterized her as strong and tough. Several emphasized how well she rebounded as a 16 year old after losing her father and her home (to a fire) within a two week period. Her best friend, Hopkins, described her as generally happy, and said she appeared to be in a normal state of mind when she last saw her in February, "not distressed, not overjoyed." Her primary care physician reported Keith had no psychological referrals and hadn't received treatment for depression, anxiety, or suicidal thoughts.

She did have a condition called interstitial cystitis, an irritation of the lining of the bladder which caused her chronic pelvic pain. She received medication to treat the condition and had been feeling better. Her doctor explained one of the medications could be used to treat depression at higher dosages, but said it wasn't commonly used for that purpose any more, and hadn't been prescribed for her for that reason. In a statement to police the night of the shooting, Beushausen said Keith had never said anything to indicate depression or that she was having suicidal thoughts. However, he pointed out one of her medications for interstitial cystitis is "for depression a little bit." He said her condition left them unable to have a regular sexual relationship. He said they'd had sex only once in their time together and thought that might have been a source of depression for her.

Beushausen, meanwhile, had a serious drinking problem. His employer reported they were aware of his problem with alcohol because it caused him to miss time at work.

3

Home Depot had helped him participate in two or three rehabilitation programs. However, his problems had continued, and they'd warned he could be terminated if the problem persisted.

His drinking was also harming his relationship with Keith. She had told friends and colleagues she was struggling because of Beushausen's drinking. In late December, she texted a friend to say he had been drinking for four days and was too drunk to talk. She said, "This might be the end for us." By mid-February, she told a friend things weren't improving and she was leaning toward leaving. She said she'd stayed with him for the last few months hoping he would quit drinking and get better.

Beushausen had stopped drinking for a few weeks leading up to the shooting. However, on the morning of March 14, 2017, Keith woke up and found him drunk. She told friends she had decided to leave him. She was going to tell him he had to choose between drinking and their relationship as soon as he got sober.

That morning, she noticed Beushausen had drunk two and a half pints of vodka. When she asked what he was doing, he said he was texting someone and to mind her own business. He then took his phone and broke it by repeatedly slamming it into the wall. Keith reported Beushausen got in her face and screamed at her and had his pistol out of the safe. She said she was shaking and scared and put the gun back in the safe and hid the keys.

Eventually, Beushausen passed out. Keith almost called the police but called Beushausen's sister for help instead. Keith told his sister he had been drinking and she

4

was afraid he wouldn't be able to go to work and would lose his job. She reported he would drink "[b]ottles and bottles of vodka," and reported he had been suspended from work multiple times and warned he was at risk of being fired. She said, "Two weeks ago, he put his hands on me, sober. Then today, he put his hands on me, drunk. Then he shattered his phone. If he doesn't go to work tonight, he'll be fired. I don't want to leave him while he's down, but he keeps doing this to me, and it's not good for me physically or mentally."

Keith texted a friend at 8:45 that morning saying, "James and I got into a huge fight this morning over his drinking so I'm getting close to leaving him." She said, "I need to tell him when he's sober so it won't be a huge physical mess. But I'm very scared. I can't live like this. It's making me . . . physically, mentally, and emotionally sick." Her friend told her she had a place to stay, and Keith said she would come over if Beushausen didn't want to get better. The same day, she called her supervisor, crying, and told him she couldn't work that day because "I have to take care of him. He's all fucked up."

That night, Beushausen got to work almost an hour late for his 8:00 p.m. shift. He called Keith twice just before 10:00 p.m., but she didn't answer. He took his lunch break around 11:00 p.m., which was unusually early, and went home to talk to Keith about their argument. However, he found her asleep and instead took a nap before returning to work about 12:30 a.m.

Beushausen's coworker said Beushausen seemed distant that night. He talked to Beushausen around 5:30 a.m. and said he seemed out of it, had tears in his eyes, and was "definitely off." Lopez asked Beushausen if he was okay, and Beushausen said he'd been drinking and got into a fight with his girlfriend. He said he'd been in a rage and broke his phone. He said he feared it might be too late to patch things up. Lopez talked to Beushausen again shortly after 6:00 a.m. and described him as even more down. Beushausen said, "I'm going home for the day. I'm tired."

Beushausen left work early around 6:30 a.m. He picked up food at a nearby restaurant and bought a 200-milliliter bottle of vodka. He woke Keith when he got home and offered her some food, but she didn't want any, so he ate by himself and drank the bottle of vodka. Beushausen said Keith got up at one point to go to the restroom but got back in bed.

Beushausen claimed he fell asleep and was woken by a pop or an explosion. He told police he went outside to look for Keith. When he returned, he saw her lying in the bathtub. He said at first he thought she'd slipped and fallen, but then he noticed a cut on her forehead and blood coming out of her left ear. At that point, at 9:25 a.m., he used Keith's phone to call 911 and reported she had fallen and had a head injury. Beushausen then reported Keith had shot and killed herself. He said he noticed a hole in the blanket covering Keith, and picked her up and saw the firearm under her. He said he retrieved the gun and put it on top of her body. First responders pronounced Keith dead at the scene.

When firefighters arrived, they found Beushausen calm and unemotional. He wasn't wearing a shirt and had blood on him. He didn't appear to be intoxicated. He was holding Keith's phone, opening text messages and scrolling through messages. At 9:30 a.m., Beushausen called his sister and told her Keith had shot herself. His sister said she went to the house and found Beushausen sobbing. A friend of Keith's reported Beushausen was solemn and had a blank stare.

Experts estimated Keith died between 6:00 a.m. and 10:00 a.m. In addition to being shot, she had suffered a blunt force injury on the left of her skull. The forensic pathologist, Mark Scott McCormick, who performed her autopsy said there was hemorrhage in the left side of her head. However, he said he couldn't tell whether the injury was severe enough to have knocked Keith unconscious.

Police found Keith's body lying in the bathtub with a handgun on top of her torso. Her torso was wrapped back to front in a red blanket that had two holes that were close together as if caused by a single bullet going through a folded portion of the blanket. Soot and holes in the blanket indicated the blanket was between the end of the barrel of the gun and Keith's skin when the gun was fired. Keith had many particles of gunshot residue on her hands, but a police criminalist said that would happen just from being shot.

The bullet entered the middle of Keith's forehead and lodged in her skull. Police found blood spatter all around the tub, on the shower wall, on the red blanket, on Keith's body, and to the right of her body. The gun was covered in blood, and there was blood in the barrel of the gun. There was little or no blood spatter on Keith's hands. A prosecution

blood spatter expert, Craig Ogino, indicated that fact was consistent with Keith being the shooter. He said he couldn't tell from the blood spatter whether Keith had held the gun and fired into her own forehead.

Another blood spatter expert, William Matty, disagreed with Ogino's opinion. Asked what he would expect her hands to look like if she had been the shooter, he said, "Well, because we have quite . . . a bit of blood going, let's say forward from her head, I would expect that her hands would have more blood than what I saw in the photographs. In fact, when I did the watermelon shot . . . I got fairly splattered with watermelon material on my hands, on the firearm, on my face, I was wearing a hat, it was on my hat. It was on the front of my shirt. So quite a bit of material came towards me." He said that had happened even though he had placed a blanket between the watermelon and the muzzle of the gun.

Based on the blood spatter, both experts determined Keith was already lying in the bathtub when she was shot. Ogino said it appeared her legs and hand had been moved after she was shot. Based on bruising and abrasions to Keith's forehead, McCormick, the forensic pathologist, said it appeared the gun was pressed tightly against her forehead when fired. The bruising was caused by a guide rod that protrudes after firing. Matty said he believed a person couldn't hold a gun firmly enough to their own forehead to cause guide rod bruising because the bullet wound would instantly incapacitate the shooter, who would go limp.

Police obtained Keith's cell phone from Beushausen after the shooting and he gave them the password. At 8:44 a.m. the day of the shooting, someone used a search engine to search the phrase "IC suicide rate," which produced a link to "Suicide and IC-inspire." The user clicked the link, which took them to a blog for people who suffer from interstitial cystitis. About 8:45 a.m., someone searched for the name of an expert on dealing with interstitial cystitis. The user didn't click on that link.

The Riverside County District Attorney charged Beushausen with one count of murder (Pen. Code, § 187, subd. (a), unlabeled statutory citations refer to this code), alleged he had personally and intentionally discharged a firearm in committing the murder (§ 12022.53, subd. (d)), and also charged him with two counts of willfully and unlawfully possessing an assault weapon (§ 30605, subd (a)).

After trial, a jury convicted him of first degree murder and found he personally and intentionally discharged a firearm in committing the offense. The trial court sentenced Beushausen to 50 years to life.

Beushausen filed a timely notice of appeal.

## II

## ANALYSIS

A. *Instruction on Voluntary Manslaughter*

Beushausen argues the trial court erred when it failed to instruct the jury on voluntary manslaughter as a lesser included offense of murder.

Trial courts have a duty in criminal cases to instruct juries on all general principles

of law relevant to the issues raised by the trial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) A trial court errs if it fails to instruct on a lesser included offense supported by substantial evidence, even if the defendant doesn't request the instruction. However, the court needn't instruct the jury on lesser included offenses if they aren't supported by substantial evidence. (*Id*. at p. 162.) "'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed." (*Ibid*.) We independently review whether the lesser included was supported by substantial evidence. (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Voluntary manslaughter is defined as the unlawful killing of a human being without malice upon a sudden quarrel or in the heat of passion. (§ 192, subd. (a).) Voluntary manslaughter can be based on a killing in the heat of passion or on imperfect self-defense. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) Both forms of voluntary manslaughter are lesser included offenses of murder. (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Breverman*, *supra*, 19 Cal.4th at p. 154.) Here, Beushausen argues the heat of passion form of involuntary manslaughter had substantial support at trial.

"The fundamental inquiry when examining heat of passion in the context of manslaughter "'is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection,

10

and from this passion rather than from judgment.'" [Citation.] Heat of passion is 'a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.' [Citation.] Further, the 'proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.'" (*People v. Nelson*, *supra*, 1 Cal.5th at pp. 538-539.)

"This, however, 'does not mean that a defendant does not form malice unless he thinks rationally or exercises sound judgment.' [Citation.] For purposes of the heat of passion doctrine, 'provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment.' [Citation.] The standard requires more than evidence that a defendant's passions were aroused. The facts and circumstances must be '"sufficient to arouse the passions of the ordinarily reasonable [person]."' [Citation.] Moreover, the defendant must 'actually be motivated by passion in committing the killing'; that is, he or she must be acting '""under the smart of that sudden quarrel or heat of passion."""' (*People v. Nelson*, *supra*, 1 Cal.5th at p. 539.)

The evidence didn't require the court to give an instruction on heat of passion in this case. In the first place, Beushausen's primary defense was he was innocent of the homicide because Keith killed herself. It follows that none of the evidence Beushausen relied on to show this was a case of suicide supports giving the heat of passion instruction. Some courts have gone farther, concluding "when a defendant completely

11

denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709; see also *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1015, 1021-1022 [a lesser included offense instruction is not required if the defendant disclaims all responsibility for harming the victim].)

Even if his denial of involvement in the shooting doesn't foreclose him from claiming on appeal that he shot Keith only in the heat of passion, the record simply doesn't support the theory. He suggests Keith provoked him by telling him she was leaving. However, telling a lover you're leaving isn't sufficient to arouse the passions of the ordinarily reasonable person. Indeed, the situation is as common as dirt, and reasonable people are built of tougher stuff. Thus, even if there was evidence showing Keith had told Beushausen that she was going to leave him and he shot her in response, we reject that as a legally sufficient provocation. Nor was there evidence Beushausen shot Keith "'while under "the actual influence of a strong passion" induced by . . . provocation.'" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) The evidence indicates he shot Keith point blank in the middle of the forehead through a blanket placed over her face.

In any event, it's pure speculation that Keith did in fact tell him she was leaving. As we've seen, Beushausen's story was he was asleep during the shooting. All he can point to as support for his new story is evidence that Keith had been talking to others about leaving him for his drinking. But there's no evidence that's what happened. She

12

had been talking about leaving Beushausen for months without following through. And though she made some statements to friends indicating she had reached the breaking point, her last communication with a friend who offered to give her a place to stay was to say she would take her up on it if Beushausen decided not to seek help with his alcoholism.

Beushausen suggests Keith "could have" informed him she was leaving him when he came home with vodka and that he became "intensely emotional because of their five year long relationship where there was no sexual intercourse due to Ms. Keith's medical condition from the very beginning of their relationship." This is rank speculation. Though it is a reasonable inference that they fought when Beushausen came home with vodka, there is no evidence that he became "intensely emotional" or killed in a heat of passion, certainly not due to her medical condition or their inability to engage in sexual intercourse. Even if such a reason could support a heat of passion instruction, "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.)

As the People point out, the parties and court agreed there was no evidence of provocation when they were discussing the instructions. The court said, "It's hard to conclude that [this] is not willful, premeditated, and deliberate, if it was someone other than Ms. Keith." The court noted that it was "almost a bulls-eye shot to the head—I mean, center of the forehead." When they discussed instructing the jury on second degree murder, the court said, "I don't see any evidence of a manslaughter here. If I did, I would

13

have to give [the second-degree instruction], but I don't hear you arguing vociferously that way, correct? . . . [¶] . . . [¶] . . . [I]t's either murder or suicide. You tell me if I'm wrong." Defense counsel agreed. Though we acknowledge the defense's agreement doesn't relieve the court of its responsibility to instruct on a lesser included with substantial evidence, it's nevertheless revealing that the court and the parties considered the issue explicitly and concluded there was no substantial evidence to require the instruction.

We conclude the court approached this issue properly and correctly concluded it was not required to instruct the jury on the lesser included offense of heat of passion voluntary manslaughter.

B. *Substantial Evidence of Murder*

Beushausen argues his murder conviction isn't supported by substantial evidence. As support, he cites three deficiencies in the evidence—(1) one prosecution expert witness said he couldn't rule out suicide based on the blood spatter evidence, (2) Keith had gunshot residue on her hands but Beushausen didn't, and (3) the severity of the blunt force trauma injury couldn't be determined.

In assessing a claim for insufficient evidence, we "'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.) We focus on the whole record, not

14

isolated bits of evidence. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1203.) We don't reweigh the evidence, and the fact that the evidence might lead us to reach a different verdict doesn't mean the evidence supporting the verdict is insubstantial. (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

We start with the very strong evidence that Beushausen, not Keith, was the shooter. McCormick, the forensic pathologist, testified that the physical evidence showed someone held the gun tightly against Keith's forehead when they shot her. Her forehead showed bruising from being struck by the gun's guide post, which occurs after the bullet fires. The prosecution expert testified Keith could not have held the gun tightly enough to result in such bruising, because as soon as she pulled the trigger, the bullet would enter the brain, and the pressure would cease. In addition, a blood spatter expert said Keith would have had more blood on her hands had she shot the weapon. The jury was entitled to believe this evidence, and it provided a sufficient basis for the jury to find Beushausen shot Keith.

Beushausen argues the blood spatter evidence on Keith's hands was consistent with her committing suicide. He points to the testimony of Craig Ogino, a second prosecution expert, that he couldn't tell from the lack of blood on Keith's hands whether she had fired the gun. He also points out that the other expert conceded it was "certainly possible" the blood spatter could have been accomplished by a self-inflicted wound. While this testimony provided a basis for the jury to conclude the blood spatter evidence did not point to Beushausen as the shooter, they were not required to reach that

15

conclusion. On the contrary, they reasonably could have believed Matty, who opined that had Keith been the shooter, he would have expected her to have a lot more blood on her hands and described a reconstruction using a watermelon as support for his opinion. The forensic pathologist, McCormick, also testified that the amount of blood on Keith's hands was not consistent with her holding and firing the gun. In short, Beushausen's attempt to isolate the helpful testimony of one witness doesn't provide a basis for casting aside all the other evidence and concluding the jury acted unreasonably.

Beushausen's other objections have the same defect. He argues the evidence that Keith's hands had gunshot residue on them while Beushausen's hands had very little gunshot residue shows it was her who fired the gun. The parties stipulated that Beushausen had no gunshot residue on his right hand, and one characteristic and two consistent particles on his left hand. They also stipulated that Keith had many characteristic particles of gunshot residue on both her hands. Beushausen would have us conclude this evidence *compelled* the jury to find Keith was the shooter. That's not right. The parties also stipulated that the gunshot residue evidence was consistent with a finding that either one shot the gun, was near the gun when it was fired, or touched a surface with gunshot residue. Moreover, Matty testified that the amount of gunshot residue on Keith was what you would expect from being shot. Further, the fact that Beushausen had little gunshot residue on his hands isn't surprising. Matty testified that washing your hands is effective in eliminating gunshot residue. Since Beushausen admitted touching the gun after it had been fired but had little blood or gunshot residue on his hands, the jury could

16

reasonably have inferred he had washed his hands before police arrived.

Finally, Beushausen argues the fact that expert witnesses were unable to determine whether the blunt force injury on Keith's head caused her to lose consciousness undermines the prosecutor's theory that Beushausen knocked Keith out before he shot her. The prosecutor argued Keith was unconscious when Beushausen shot her. Beushausen points out that the forensic pathologist, McCormick, who examined her body said he couldn't tell from the injury whether it was sufficient to knock her out.

We conclude the point is of minor or no importance. Prosecutors don't need to prove their theories of the case, they need only prove the elements of the offense. As we've already explained, the prosecution proved the elements of first degree murder here. We cannot, consistent with our duty to view the evidence in the light most favorable to the judgment, conclude that the uncertainty about whether Beushausen rendered Keith unconscious before he shot her renders the verdict unreasonable. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

C. *Prosecutorial Misconduct*

Beushausen argues the prosecutor committed misconduct in closing arguments and incited prejudice in the jury by likening him to a child molester.

The prosecutor did so, he argues, when it explained why circumstantial evidence is important. "There is a reason that there is an instruction that says circumstantial [evidence] has equal—the same weight as direct evidence, because many crimes are not committed with an eyewitness. *Child molestation*, *often no witness except the defendant*

*and the victim*. Homicides, *very few people commit homicides in the presence of others*. So, you must consider circumstantial evidence. And from that circumstantial evidence, you can make reasonable inferences." (Italics added.) Beushausen argues the reference to child molestation inflamed the jury against him.

Beushausen didn't object to the prosecution's argument at trial. "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Huggins* (2006) 38 Cal.4th 175, 251-252.) The reason for the forfeiture rule is to give the parties and the court the opportunity to clean up errors that might improperly affect the jury's judgment without wasting the resources already expended in holding a trial. If this argument had been objectionable, the court could have repaired the problem by instruction. Here, defense counsel didn't object, so Beushausen forfeited the argument.

Even if Beushausen had properly preserved his claim, the prosecutor's argument was not improper. To establish prosecutorial error, there must be a reasonable likelihood the jury understood or applied the challenged statements in an improper or erroneous manner "in the context of the whole argument and the instructions." (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) We don't lightly infer that "the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*Ibid*.) The prosecutor's statement was meant as a commonsense example to explain the value of circumstantial evidence. Though the reference to child molestation wasn't

necessary or even particularly enlightening, her point was about the nature of evidence, not the perpetrator. The prosecutor neither said nor insinuated that Beushausen was himself a child molester. We simply can't infer that the jury mistakenly took the reference to imply anything about Beushausen, much less anything prejudicial to his defense. It would take a wild misinterpretation of the prosecutor's statement to reach the conclusion Beushausen suggests, and we can't and shouldn't attribute such error to the jury. (*People v. Benson* (1990) 52 Cal.3d 754, 793 [where challenged comments "would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable"].)

D. *Evidence of the Victim's State of Mind*

Beushausen argues the trial court erred by overruling his motion to exclude the testimony of Keith's state of mind by her best friend, Hopkins. He argues the prosecutor didn't lay a proper foundation and any opinion "beyond basic emotional states must be made by an expert." He doesn't challenge the relevance of the evidence or argue it wasn't a proper subject for inquiry by a lay witness.

The prosecutor asked Hopkins to describe Keith's state of mind or mood the last time she saw Keith in February. Beushausen objected that testimony about her general state of happiness was improper because there was no foundation. The court ruled the testimony was relevant and Hopkins had a sufficient foundation.

"A 'lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.'" [Citation.] "By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible." (*People v. Dalton* (2019) 7 Cal.5th 166, 231.) "'[A] witness may testify about objective behavior and describe behavior as being consistent with a state of mind.'" (*Id*. at pp. 231-232.) Whether someone is happy, calm or laid back is clearly admissible, as it is based on the witness's personal observations and objective behavior. (See *Ibid*.)

Hopkins' testimony about Keith's demeanor and state of mind in February, a month before the shooting, satisfies this standard, and the prosecutor elicited a sufficient foundation that Hopkins had the personal knowledge to allow her to judge Keith's demeanor. Hopkins testified she grew up with Keith, and Keith was her best friend. She said they were neighbors and spent every day together. When they were younger, they got tattoos of complementary puzzle pieces. Keith put Hopkins' initials on her ankle, and Hopkins put Keith's initials on hers. From this, we conclude the trial court did not abuse its discretion in concluding that Hopkins had a sufficient foundation to testify Keith was happy when she saw her in February.

Even if the trial court improperly admitted Hopkins' testimony, any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Many other witnesses testified that Keith was a happy, outgoing, positive person, and that she was resilient under adversity. Moreover, Hopkins' testimony about Keith didn't indicate she was in the best

state of mind. Asked whether Keith was in a positive mood, she said, "Kind of just there," which she explained as meaning "not distressed, not overjoyed, just calm, just normal." At bottom, this was a minor piece of evidence and not especially damaging to Beushausen's story that Keith had killed herself. We conclude excluding her testimony would not have produced for him a more favorable result.

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

MENETREZ
J.

21